## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                              :

      Chapter 11                                :

TRIBUNE COMPANY, et al.,                            :   Case No. 08-13141 (KJC)

       .     Debtors.                        :   Jointly Administered

                                            :

OFFICIAL COMMITTEE OF                               :
UNSECURED CREDITORS, on behalf
of the Debtors' Estates,                            :

         Plaintiff,                         :

        v.                                :   Adv. No. 10-53963 (KJC)

JPMORGAN CHASE BANK, N.A., individually and as      :
administrative agent, MERRILL LYNCH CAPITAL
CORPORATION, individually and as administrative agent, :
WELLS FARGO BANK, N.A., as administrative agent, J.P. :
MORGAN SECURITIES INC., CITICORP NORTH AMERICA,
INC., individually and as administrative agent,     :
CITIGROUP GLOBAL MARKETS, INC., BANK OF AMERICA,
N.A., BANC OF AMERICA SECURITIES, LLC, MERRILL,     :
LYNCH, PIERCE, FENNER & SMITH INCORPORATED, the 2006
BANK DEBT LENDERS identified in Exhibit C hereto, the LBO :
LENDER DISGORGEMENT DEFENDANTS identified in Exhibit D
hereto, the LBO FEE DEFENDANTS identified on Exhibit E hereto, :
the CURRENT LBO DEBTHOLDER DEFENDANTS identified on
Exhibit H hereto, DOES 1-100, OAKTREE CAPITAL           :
MANAGEMENT, L.P., OCM OPPORTUNITIES FUND VIIB
DELAWARE, L.P. BSC, ANGELO GORDON & CO., L.P., SILVER :
OAK CAPITAL LLC, AND ALDEN GLOBAL DISTRESSED
OPPORTUNITIES FUND, L.P., on behalf of themselves and a class :
of similarly situated persons and legal entities, MARATHON
SPECIAL OPPORTUNITY MASTER FUND LTD.,  KING STREET :
ACQUISITION COMPANY L.L.C., and CORPORATE DEBT
OPPORTUNITIES FUND L.P., on behalf of themselves and a class of :
similarly situated persons and legal entities,

        Defendants.                        :

## FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIMS

Plaintiff, the Official Committee of Unsecured Creditors of the Tribune Company and of 111 of its subsidiaries (the "Debtors"),[1] by and through its undersigned special counsel, on behalf of and as the representative of the bankruptcy estates of the Debtors, hereby objects to the claims filed by JPMorgan Chase Bank, N.A. and Merrill Lynch Capital Corporation and further complains against the defendants as follows:

## NATURE OF THE ACTION

1.     This is an action primarily to avoid, subordinate and/or disallow the obligations arising from the loans made and arranged by the defendants in 2007 to fund the failed leveraged buy out (the "LBO") of the Tribune Company (the "Company"), one of the most venerable news and media organizations in the United States, and to recover related fraudulent transfers or preferences.  The LBO had two principal purposes:  (a) to meet the demands of major shareholders of the Company that they be cashed out; and (b) to transfer control of the Company to Samuel Zell ("Zell").  To accomplish these purposes, the Company obligated itself to buy out all its shareholders, borrowed some $13 billion – more than doubling its prior debt load – to finance the LBO (the "LBO Debt" or "LBO Loans")[2] and caused most of its subsidiaries (the "Guarantors")[3] to guarantee that debt.  The obligations assumed by the Company in connection with the LBO rendered the Company and the Guarantors insolvent at all relevant times.  The LBO closed in December 2007.  Less than one year later, unable to carry the massive burden of the LBO Debt, the Company and most of the Guarantors filed for relief under the Bankruptcy Code on December 8, 2008 (the "Petition Date").

---

[1] The Debtors in these Chapter 11 Cases are listed on Exhibit A to this Complaint.
[2] For the purpose of this Complaint, LBO Debt shall include all indebtedness incurred by the Debtors in connection with the Senior Credit Facility and the Bridge Facility (each as defined below).
[3] The Guarantors are those subsidiaries of the Company listed on Exhibit B to the Complaint.

2.   The Company and the Guarantors did not benefit from the LBO Debt.

   a.  Pursuant to a Plan of Merger and merger agreement (the "<u>Merger Agreement</u>") entered into on April 1, 2007, over $8 billion of the LBO Loans were paid to the shareholders of the Company and provided no benefit to the Company or its creditors.

   b.  Over $2.5 billion of the LBO Loans was used to refinance the Company's pre-existing bank debt, which had been arranged in 2006 (the "<u>2006 Bank Debt</u>").  At the time of the refinancing, the 2006 Bank Debt was held primarily by certain defendants.  The refinancing materially harmed the Company by giving such defendants better terms than the 2006 Bank Debt without benefiting the Company or its subsidiaries.  The refinanced debt bore a higher interest rate than the 2006 Bank Debt and benefited from guarantees from the subsidiary Guarantors that the 2006 Bank Debt did not have.

   c.  The Guarantors received nothing for their guarantees of billions of dollars in new and refinanced debt of the Company.

   d.  Finally, over $200 million was transferred to the defendants and others for fees in connection with the LBO, again providing no benefit to the Company or its creditors.

   e.  Those who did benefit from the LBO Debt were the shareholders, whose shares were purchased with the loan proceeds and who, as a result of the cash-out, were insulated from any adverse effect the

excessive loan burden would have on the Company or its creditors; Zell, who obtained *de facto* control of the Company while placing a tiny portion of his own wealth at risk; and defendants, who received enormous fees for making and arranging the LBO Loans, improved their security on and increased the interest rates on the 2006 Bank Debt, and stood to reap very high interest on the LBO Debt.

3.    Contemporaneous e-mails and other documents in defendants' files demonstrate that defendants recognized the LBO and the LBO Debt would render the Company insolvent or, at a minimum, create a high risk of insolvency. Defendants were willing to proceed with the LBO notwithstanding the insolvency risk because they were paid large fees up front and imposed most of the insolvency risk on others. The structure of the LBO Debt and the flow of payments to third parties ensured that the Company's existing and future non-bank creditors (such non-bank creditors, together with their successors or assigns, the "Non-Bank Lenders")[4] would bear the primary risk of loss if the LBO were unsuccessful. In effect, the defendants placed a bet with the Non-Bank Lenders' money that the LBO would not cause the Company's insolvency. The Non-Bank Lenders included several hundred retirees with non-qualified retirement benefit programs upon which they rely for their retirement income.

4.    The defendants also minimized the risk they faced from the massive leverage imposed on the Company by syndicating the debt so that their default risk on the loan was transferred to purchasers of the debt who did not realize any of the fees. In

---

[4] For the avoidance of doubt, the term "Non-Bank Lenders" shall in all cases exclude the LBO Lenders as defined below.

addition, certain of the defendants sought to further or nurture relationships with Zell that would lead to other profitable business.

5.  Two of the defendants acted simultaneously as financial advisors to the Company and as lead lenders and arrangers of the LBO Loans (through affiliated entities). While occupying these conflicting roles, they advised the Company to proceed with an LBO transaction that imposed substantial burdens on the Company and its existing creditors while providing significant and massive benefits to themselves.

6.  As the date for closing the LBO approached, the likelihood that the LBO would make the Company insolvent became more and more apparent. Company management, which stood to realize substantial financial benefits if the LBO closed, responded by taking steps to ensure a favorable solvency opinion and ensure the LBO would close notwithstanding the increasing likelihood of insolvency. Those actions included making unjustifiable changes to the Company's financial projections and misleading the Company's solvency expert concerning the prospects for refinancing the LBO Debt.

7.  The creditors of the Company and the Company are entitled to substantial relief as a result of defendants' wrongful conduct. First, the Debtors' obligations on the LBO Debt, and the related guarantees and stock pledges, must be avoided because they were constructively or actually fraudulent as to the Debtors and the Non-Bank Lenders. Second, the claims of the Defendants should be subordinated to the claims of the Non-Bank Lenders or disallowed. Third, the Plaintiff is entitled to recover for the benefit of the Debtors' estates almost $2 billion in repayments on the LBO Debt made by the Debtors before the bankruptcy filing (the "LBO Repayments") and over $200 million in

fees and reimbursement of expenses that was paid to the Lead Banks (as defined below) and certain others in connection with the financing of the LBO (the "LBO Fees").

8.      Based on the facts alleged herein, Plaintiff objects to the claims filed by JPMorgan Chase Bank, N.A. and Merrill Lynch Capital Corporation as administrative agents and counterclaims for the causes of action more fully described below.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) because the claims asserted in this adversary proceeding arise in the above-referenced Chapter 11 bankruptcy cases. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court by reason of 28 U.S.C. §§ 1408 and 1409 and because the Debtors' bankruptcies, which have been administratively consolidated, are being administered in this Court.

## PARTIES

10.      Plaintiff is the Official Committee of Unsecured Creditors (the "Committee") appointed by the Office of the United States Trustee in the above-referenced bankruptcy proceedings. The Debtors have consented to the Committee commencing and prosecuting this action and all claims asserted herein on behalf of the Debtors' estates, and the Committee has been granted standing and authority by this Court to commence and prosecute this action and all claims asserted herein on behalf of the Debtors' estates.

11.      Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is named as a defendant herein individually, as one of the LBO Lenders, as defined below, as administrative agent for the "Senior Credit Facility" as defined herein, and as initial

transferee of the Step One and Incremental Repayments and certain of the LBO Fees, as defined herein.  As administrative agent for the Senior Credit Facility, JPMCB represents and acts as agent for all lenders that formerly owned or currently own an interest in the loans that comprise the Senior Credit Facility.  In that role, JPMCB submitted a proof of claim in the Debtors' cases on behalf of itself and all lenders that were parties to the Credit Agreement, including any successors or assigns of such lenders.  All such lenders, including the Current Senior Debtholder Defendants (as defined below), will be bound by the result in this action as against JPMCB as their agent.

12.    Defendant Merrill Lynch Capital Corporation ("MLCC") is named as a defendant herein individually, as one of the LBO Lenders, as defined below, as former administrative agent for the $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Facility"), and as initial transferee of the Step Two Repayments and certain of the LBO Fees as defined herein.  MLCC was administrative agent for the Bridge Facility in 2007, and as such MLCC represented and acted as agent for all lenders that formerly owned or currently own an interest in the Bridge Facility.  In that role, MLCC submitted a proof of claim in the Debtors' bankruptcy cases on behalf of itself and all lenders that were lenders under the Bridge Facility, including any successors or assigns of such lenders.  All such lenders, including the Current Bridge Debtholder Defendants (as defined below), will be bound by the result in this action as against MLCC as their agent. MLCC contends that Wells Fargo Bank, N.A. assumed all of its obligations as administrative agent of the Bridge Facility some time after 2007.  If the facts bear that out, the Committee will amend this Complaint as appropriate.  MLCC also served as

syndication agent for the 2006 Bank Debt and the Senior Credit Facility and as one of the lead arrangers for the 2006 Bank Debt, the Senior Credit Facility and the Bridge Facility.

13.   Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") acted as financial advisor to the Tribune Company in connection with the LBO (together with MLCC, "Merrill Lynch") and served as one of the lead arrangers for the Senior Credit Facility and the Bridge Facility.

14.   Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is the current administrative agent of the Bridge Facility.  As administrative agent for the Bridge Facility, Wells Fargo represents and acts as agent for all lenders that formerly owned or currently own an interest in the Bridge Facility.  All such lenders, including the Current Bridge Debtholder Defendants, will be bound by the result in this action as against Wells Fargo as their agent.

15.   Defendant J.P. Morgan Securities Inc. ("JPMS"), an entity under common control with JPMCB, is named as a defendant herein and served as one of the lead arrangers for the 2006 Bank Debt, the Senior Credit Facility and the Bridge Facility (together with JPMCB, "JPM").

16.   Defendant Citicorp North America, Inc. ("Citicorp") served as co-documentation agent for the Senior Credit Facility and the Bridge Facility.  As co-documentation agent, Citicorp materially facilitated the lending described below.  Citicorp also is named as a defendant as administrative agent for the 2006 Bank Debt.

17.   Defendant Citigroup Global Markets, Inc. ("CGMI"), an entity under common control with Citicorp, acted as financial advisor to the Company in connection

with the LBO and served as one of the lead arrangers for the 2006 Bank Debt, the Senior

Credit Facility and the Bridge Facility (together with Citicorp, "Citigroup").

18.    Defendant Bank of America, N.A. served as co-documentation agent for the

2006 Bank Debt, the Senior Credit Facility and the Bridge Facility.  As co-documentation

agent, Bank of America, N.A. materially facilitated the lending discussed below.

19.    Defendant Banc of America Securities LLC ("BAS"), an entity under

common control with Bank of America, N.A., served as one of the lead arrangers for both

the Senior Credit Facility and the Bridge Facility (together with Bank of America, N.A.,

"Bank of America").

20.    Defendants Marathon Special Opportunity Master Fund Ltd., King Street

Acquisition Company L.L.C., and Corporate Debt Opportunities Fund L.P. (the "Bridge

Lender Defendants"), on information and belief,  are Current Bridge Debtholder

Defendants, as defined below.

21.    Non-party Morgan Stanley & Co. Inc. ("Morgan Stanley") was engaged by

the Company to act as a financial advisor to the Special Committee of the Board of

Directors of the Company in connection with the LBO.  In addition, Morgan Stanley

acted as a financial advisor to the Company in late 2008, immediately before the Petition

Date.

22.    The relief sought in this action is intended to bind the defendants and,

through each of them, each of the banks and other lenders participating currently,

previously or in the future in the Senior Credit Facility and the Bridge Facility

(collectively, the "LBO Lenders").  In addition, the Committee intends to name all LBO

Lenders individually as defendants, although not all of such LBO Lenders are presently

known to the Committee. Those LBO Lenders currently known to the Committee and named as defendants herein are set forth in Exhibits D and H hereto. Does 1-100 (the "Additional Parties") are LBO Lenders presently unknown to the Committee. The identities of the Additional Parties will be determined through discovery in this proceeding.

23.    Those LBO Lenders that received payments of principal and interest with respect to the Senior Credit Facility or the Bridge Facility (the "LBO Lender Disgorgement Defendants") are set forth in Exhibit D hereto and are named as defendants herein.

24.    Those LBO Lenders that currently hold an interest in the Senior Credit Facility (the "Current Senior Debtholder Defendants") or currently hold an interest in the Bridge Facility (the "Current Bridge Debtholder Defendants"; collectively, the "Current LBO Debtholder Defendants") are set forth in Exhibit H hereto and are named as defendants herein. Those lenders currently or in the future owning an interest in the Senior Credit Facility or Bridge Facility are bound by the actions of their predecessors in interest with respect to such loans, and references to actions by "LBO Lenders" therefore include actions taken by the predecessors in interest of the Current LBO Debtholder Defendants.

25.    Upon information and belief, defendants Oaktree Capital Management, L.P., OCM Opportunities Fund VIIB Delaware, LP BSC, Angelo Gordon & Co., L.P., Silver Oak Capital LLC, and Alden Global Distressed Opportunities Fund, L.P. (the "Senior Lender Defendants") are Current Senior Debtholder Defendants, and/or a general partner or manager of an entity that is a Current Senior Debtholder Defendant .

26.     Debtors made a transfer of an interest of the Debtors in property of $2,534,437,415.56 to Citicorp as administrative agent for the 2006 Bank Debt to satisfy that debt in full (the "2006 Repayment").  Those lenders that received proceeds from the 2006 Repayment are set forth in Exhibit C and are named as defendants herein (the "2006 Bank Debt Lenders").  The Committee has attempted to identify all such 2006 Bank Debt Lenders who received any portion of the 2006 Repayment, and reserves the right to add as additional parties other 2006 Bank Debt Lenders if necessary to obtain complete relief.

## CLASS ALLEGATIONS

27.     Pursuant to Rule 23(b)(1) & (b)(2) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, the claims set forth in Counts One through Five, Seven, Nine and Eleven of this Complaint, as brought against the defendants named in ¶ 25, are brought against those defendants individually and as representatives of a defendant class of similarly situated persons and legal entities (the "Senior Lender Class").

28.     Pursuant to Rule 23(b)(1) & (b)(2) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, the claims set forth in Counts One through Five, Seven, Nine and Eleven of this Complaint, as brought against the defendants named in ¶ 20, are brought against those defendants individually and as representatives of a defendant class of similarly situated persons and legal entities (the "Bridge Lender Class")

29.     The Senior Lender Class is comprised of all persons or legal entities participating currently, previously or in the future in the Senior Credit Facility, as defined below, including but not limited to those participants in the Senior Credit Facility

identified in Exhibit D hereto and the Current Senior Debtholder Defendants identified in Exhibit H hereto.

30.    The Bridge Lender Class is comprised of all persons or legal entities participating currently, previously or in the future in the Bridge Facility, as defined below, including but not limited to those participants in the Bridge Facility identified in Exhibit D hereto and the Current Bridge Debtholder Defendants identified in Exhibit H hereto.

31.    The Committee will designate sub-classes if and to the extent that conflicts exist or develop among members of the Senior Lender Class and/or the Bridge Lender Class that make sub-classes appropriate or necessary.

32.    Upon information and belief, the Senior Lender Class and Bridge Lender Class are so numerous that joinder of all of their members is impracticable.

33.    There are questions of law and fact common to the Senior Lender Class and the Bridge Lender Class that predominate over any issues that may involve individual members of such classes, including without limitation:

(a) Whether the LBO Obligations and Equity Value Transfers (both as defined below) applicable to the Senior Lender Class and the Bridge Lender Class should be subordinated, avoided or disallowed;

(b) Whether the Debtors received less than reasonably equivalent value in exchange for the LBO Obligations and Equity Value Transfers;

(c) Whether the Debtors were insolvent at the time the LBO Obligations were incurred and the Equity Value Transfers were made;

(d) Whether, at the time the LBO Obligations were incurred and the Equity Value Transfers were made, the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which the Debtors were left with unreasonably small capital;

(e) Whether, at the time the LBO Obligations were incurred and the Equity Value Transfers were made, the Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured; and

(f) Whether any benefits or proceeds of avoided obligations, avoided and recovered transfers, disallowed claims and/or preserved value resulting from the claims set forth below must not be shared with JPMCB, MLCC, Wells Fargo or any holder of Bank Claims or Guarantee Claims, as defined below, or LBO Debt for the reasons given and based on the allegations made in Counts Four and Five, until all of the Non-Bank Claims, as defined below, against the Company have been paid in full and, consequently, as to each Debtor, any value that results from such avoidance, disallowance and/or recovery must be paid or distributed to the holders of the Non-Bank Claims before any payment or distribution is made to

JPMCB, MLCC, Wells Fargo or any holder of Bank Claims,

Guarantee Claims or LBO Debt.

34.    Any possible defenses of the Senior Lender Defendants or the Bridge

Lender Defendants are typical of those of the Senior Lender Class and Bridge Lender

Class, respectively.

35.    The Senior Lender Defendants and Bridge Lender Defendants will fairly

and adequately protect the interests of the Senior Lender Class and Bridge Lender Class,

respectively.

36.    The prosecution of separate actions against the individual members of the

Senior Lender Class and Bridge Lender Class would create a risk of (a) inconsistent or

varying adjudications with respect to individual members of such classes that would

establish incompatible standards of conduct, and/or (b) adjudications with respect to

individual members of such classes that, as a practical matter, would be dispositive of the

interests of the other members not parties to the individual adjudications or would

substantially impair or impede their ability to protect their interests.

37.    A defendant class action is superior to other available methods for fairly and

efficiently adjudicating this controversy because, inter alia, it avoids a multiplicity of

individual adjudications with respect to the individual members of the Senior Lender

Class and the Bridge Lender Class, thereby conserving the resources of the Debtors'

estates and of the Court.

## FACTUAL BACKGROUND

38.    The Company is the owner of a multitude of media businesses providing

newspaper, radio, television and entertainment products and services to nearly 80% of the

households in the United States.  The Company is divided into two business groups:  (a) publishing; and (b) broadcasting and entertainment.  The publishing group owns major newspapers and related Internet web sites in many of the most significant markets in the United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, and the *Hartford Courant* newspapers.  The broadcasting and entertainment group includes numerous radio and television stations in major markets.  In addition, the Company owns many other prominent media and entertainment properties, and interests in other real estate and entertainment properties.  As of the date the Company initiated these bankruptcy proceedings, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment employed an additional 2,600 full-time equivalent employees.

39.    Until the LBO closed, the Company was publicly traded with its stock listed on the New York Stock Exchange.  Among the largest shareholders of the publicly traded Company prior to the LBO were Chandler Trust Nos. 1 and 2 (together, the "Chandler Trusts"), which owned the Times Mirror Company, publisher of the *Los Angeles Times* newspaper before its acquisition by the Company in 2000.  Representatives of the Chandler Trusts were directors of the Company during the time leading up to the LBO.

40.    Prior to 2006, the Company's debt was modest in relation to the size of the Company's business and consisted primarily of publicly traded bonds and subordinated debentures.  Between 1992 and 1997 the Company issued bonds in the aggregate amount of $1.26 billion, which were evidenced by unsecured notes with maturity dates ranging between December 8, 2008 and November 2026 (collectively, the "Bond Debt").  Each of

15

the indentures governing the Bond Debt provides that it shares *pari passu* in payment priority with all other non-subordinated debt owed by the Company.  The Bond Debt is not, however, guaranteed by any of the Company's subsidiaries.  As of the Petition Date, the outstanding amount of the Bond Debt was approximately $1,263,463,000.

41.    In April 1999, the Company issued a series of subordinated debentures in the aggregate principal amount of $1.3 billion (the "PHONES"), the trading value of which was linked to the trading value of AOL Time Warner company stock.  The PHONES are subordinated in right of payment to all other funded indebtedness of the Company.

42.    The Company and its subsidiaries also owed various other debt to trade creditors and others incurred in the ordinary course of business.  Among the other creditors affected by the LBO are approximately 450 retirees of the Company, many of whom gave a lifetime of service to the Company.  These retirees are beneficiaries of four non-qualified plans provided by the Company, as well as various individualized retirement agreements.  The claims of these retirees against the Company exceeded $125 million as of the Petition Date.

43.    The Bond Debt, PHONES and other unsecured non-bank debt of the Company are referred to collectively as the "Non-Bank Debt."

## STRATEGIC REVIEW

44.    Beginning in late 2005, the Company's Board of Directors (the "Board") undertook a strategic review of the broadcasting and entertainment sector of the Company's business and considered possible changes to the structure and ownership of its properties.  The Company retained the services of Merrill on or about October 17,

2005, to assist in this evaluation and approved in advance the participation of Merrill or its affiliates in financial transactions that might develop from the strategic review. The Company later retained CGMI to assist in the evaluation as well and provided to CGMI the same advance approval for CGMI or its affiliates to participate in financial transactions resulting from the review. Pursuant to their advisory engagements with the Company, both Merrill and CGMI stood to reap millions of dollars in fees, fees that would increase if the Company entered into a transaction at the recommendation of Merrill and CGMI. The Company paid CGMI and Merrill over $25 million in advisory fees (the "Advisory Fees").

## CASHING OUT SHAREHOLDERS – ROUND ONE

45.    In May 2006, the Board, with the advice of Merrill and CGMI, decided to engage in a leveraged recapitalization transaction pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock. The Chandler Trusts' three representatives on the Board voted against the transaction. The Company nonetheless proceeded to repurchase 55 million of its shares for a total of nearly $1.8 billion through a public tender offer and a private transaction with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (the "Foundations"). As a result of these share repurchases, the Chandler Trusts became the Company's largest stockholders. The Foundations continued to be major shareholders.

46.    In June 2006, primarily to finance the share repurchases described above, the Company entered into a credit agreement for the 2006 Bank Debt with Citicorp as administrative agent; Merrill as syndication agent; Bank of America, N.A., Morgan Stanley Bank and JPMCB as three of the four documentation agents; and CGMI, Merrill

and JPMS as joint lead arrangers and joint bookrunners.  As of December 31, 2006, there

was approximately $2.8 billion of the 2006 Bank Debt outstanding.

## THE CHANDLER TRUSTS SEEK TO CASH OUT

47.    On or about June 13, 2006, the Chandler Trusts sent a letter to the Board,

stating that the Chandler Trusts would not tender their shares in the leveraged

recapitalization, which they found ill-advised and hasty.  The Chandler Trusts pressed the

Board to explore other strategic alternatives including a leveraged buy out.  The Chandler

Trusts publicly filed the letter.

48.    From the summer of 2006 until April 2007, the Chandler Trusts continued to

press the Board to take steps that would allow the Chandler Trusts to cash out some or all

of their Company shares through a sale or recapitalization of the Company.

49.    In response to the pressure from the Chandler Trusts, the Company decided

in September 2006 to pursue a sale or recapitalization and formed a special committee of

the Board (the "Special Committee") to consider and evaluate sale and recapitalization

alternatives, excluding from its membership the Chandler Trusts' representatives.  In or

around October 2006, the Company retained Morgan Stanley to act as the financial

advisor to the Special Committee.  The Company agreed to, and did, pay Morgan Stanley

$10 million in fees and reimbursed its expenses for serving in that role.

50.    Although Morgan Stanley was the Special Committee's financial advisor, it

was Merrill and CGMI that solicited third parties to express interest in a buyout of the

Company.  By October 2006, 17 potential outside purchasers had expressed interest in

the Company.  Merrill and CGMI acted as advisors to the Company in evaluating these

proposals.  However, Merrill and CGMI each had an inherent conflict of interest.  If any

of the transactions went forward, Merrill and CGMI, or their affiliates, were highly likely to participate in financing the transactions and stood to make tens of millions of dollars in fees from such financing. If no transactions took place, they would still receive millions of dollars in advisory fees, but much less than the financing fees associated with a large transaction. Merrill and CGMI thus had a strong financial incentive to advise the Company to agree to a substantial sale or recapitalization even if doing so was not in the best interest of the Company. Both Merrill and CGMI were in fact strong advocates for the LBO.

51.    Among the parties expressing interest in late 2006 in a buyout of the Company's shareholders was Equity Group Investments, LLC ("EGI"), owned principally by Zell, a prominent, successful Chicago-based real estate investor. Zell was advised by JPM in his structuring of the transaction. JPM later took the lead in arranging the financing of the LBO.

52.    Many companies expressed initial interest in the Company. By February 2007, however, only two third-party bidders (and the Chandler Trusts) remained interested in the Company, one of whom was Zell. Notwithstanding favorable overall market conditions, interest in the auction was depressed by severe deterioration in the newspaper business.

53.    Both remaining third-party bids contemplated highly leveraged transactions financed primarily by enormous loans to be taken on by the Company. Under both proposals, the bidders' equity contributions would be small in relation to the size of the transactions.

54.    In addition to the two third-party bids, the Company was considering in February 2007 a possible recapitalization of the Company and a spin-off of its broadcasting business under which the Company would pay a special dividend of $20 or more per share before the spin-off.

55.    While the bid process moved forward, the Company's financial results deteriorated.  By February 2007, the Company had already lowered its internal forecast of 2007 financial results because of lackluster results in the first month of the year. Company management and members of the Special Committee expressed concern about any deal that would require the Company to take on a large amount of debt given the weakening business outlook for newspapers.

## THE ZELL LBO STRUCTURE

56.    Under the LBO structure Zell proposed originally, the Company would increase its total debt load to over $14 billion – more than ten times its projected annual earnings before interest, taxes, depreciation and amortization ("EBITDA") – to buy out the public shareholders and refinance the 2006 Bank Debt.

57.    Under Zell's proposal, the Company would end up owned by a newly formed employee stock ownership plan ("ESOP") for the Company's employees.  Zell's entity, EGI, would invest $315 million and obtain warrants entitling it to buy up to a 40% stake in the Company, and Zell would become Chairman of the Board.  This structure achieved the two goals of satisfying the large shareholders' demands to be cashed out and vesting control of the Company in Zell.

58.    The Company's financial advisors, Merrill and CGMI, advised the Company with respect to Zell's proposal.  Their inherent conflict of interest as advisors

and potential lenders crystallized as the Zell proposal moved forward.  At the same time
Merrill and CGMI were advising the Company on Zell's proposal, they were already
negotiating for themselves or their affiliates to provide financing for the LBO transaction
from which they would receive millions of dollars in fees and interest at premium rates
far higher than the 2006 Bank Debt.  Because Zell's proposal called for refinancing the
2006 Bank Debt, Merrill and CGMI also stood to benefit, to the extent that they
participated in the 2006 Bank Debt, from increased interest rates and improved security
in the form of subsidiary guarantees.  They were thus inherently biased in favor of the
LBO without regard to whether it was in the Company's interests.

### THE COMPANY DECIDES TO PROCEED WITH THE ZELL LBO

59.    On March 10, 2007, the Company informed Zell that it was reconsidering
whether to proceed with his LBO proposal because, among other things, of the high
degree of leverage under that proposal.  Thereafter, the Company discussed with the
Chandler Trusts and the Foundations the possibility of pursuing a recapitalization and
spin-off transaction with a lower per share dividend to reduce the leverage required for
that transaction.

60.    The pause in the Company's interest in the Zell LBO transaction was brief.
After the other remaining third-party bidder failed to develop a satisfactory competing
proposal, and notwithstanding concerns about the leverage contemplated by the Zell LBO
proposal, the Board, acting with advice from Merrill, CGMI and Morgan Stanley
(through its recommendations to the Special Committee), approved the LBO proposed by
Zell at a final price of $34 per share at a meeting on April 1, 2007.  The Board approved

the LBO as a whole, not merely the first step tender offer described *infra*, evidencing the Board's understanding that the LBO was a single integrated transaction.

61.   Also on April 1, 2007, the Board approved, and the Company signed, the Merger Agreement, which obligated it to proceed with the LBO by buying all the publicly owned shares of the Company in two steps.   As set out in the Merger Agreement, the Company agreed first to make a tender offer for purchase of approximately one-half of the outstanding shares of the Company (126,000,000 shares) at a price of $34/share ("Step One").   Total consideration for Step One was approximately $4.284 billion.   Pursuant to the Merger Agreement, the Company also committed to convert to cash the remaining publicly owned shares of the Company following regulatory approvals from the Federal Communications Commission (the "FCC"), required for certain aspects of the LBO, at a price of $34/share ("Step Two").   Total consideration associated with Step Two was some $4 billion.   The Company committed in the Merger Agreement and otherwise to undertake all actions necessary to consummate the LBO in its entirety.

62.   At all relevant times, consistent with the Merger Agreement and related transactional documents, the Company viewed and publicly described the LBO as a single integrated transaction occurring in two steps primarily to allow time to obtain approvals from the FCC.   The Company intended at all relevant times to complete the LBO and was obligated, pursuant to the Merger Agreement and otherwise, to do so.

63.   For example, the Company's April 2, 2007 press release announced that the Company had entered "a transaction which will result in the company going private and

Tribune shareholders receiving $34 per share" and that "[s]hareholders will receive their consideration in a two-stage transaction."

64.    Documents prepared by the LBO Lenders similarly confirm that the LBO Lenders considered the LBO to be a single integrated transaction executed in two steps. For example, a March 2007 presentation prepared by Merrill Lynch, Citigroup, and JPM approached the LBO as a single transaction:

> Our proposed financing structure assumes a signed purchase agreement whereby Equity Group Investments and an ESOP purchase Tower [the Company] for $33 per share (the "Transaction").
>
> We believe that the rating agencies will immediately rate Tower pro forma for the entirety of the Transaction when the purchase agreement is signed.  Thus, we assume a B2/B corporate rating in our analysis for both steps.
>
> Merrill Lynch, Citigroup and JP Morgan recommend that Tower and Equity Group Investments approach the ratings agencies and employ their advisory services to facilitate a rapid, private reading on the prospective ratings for the whole Transaction.

65.    In April 2007, JPM distributed an internal "deal alert" touting its role in advising Zell "on the $13.3 billion take-private of Tribune and [that JPM] will serve as Joint Bookrunner on $11.2 billion of loan and high yield financing."  The deal alert stated that "Tribune and Sam Zell announced that they have entered into a definitive agreement to take the Company private in a two step transaction."

66.    In May 2007, when Citigroup's Leveraged Finance department sought final internal approval to participate in the financing of the LBO, it similarly described the transaction to take the Company private as a single one that would occur "in two steps" with two stages of financing.

67.   At the same time as the Merger Agreement, the Chandler Trusts entered into a stock voting agreement, committing them to support the LBO.  The Chandler Trusts' shares, together with the remaining shares held by the Foundations, would be cashed out at top-dollar at the expense of the Company and the Non-Bank Lenders.

## FINANCING THE LBO

68.   While negotiating the Merger Agreement, Zell and the Company also worked to develop a financing package that would enable the Company to pay the shareholders the over $8 billion necessary to the implementation of the LBO, to refinance the 2006 Bank Debt and to pay over $200 million in fees.  On April 1, 2007, the same day the Company signed the Merger Agreement, a consortium of four lenders, JPMCB, MLCC, Citigroup, and Bank of America, N.A. (the "Lead Banks"), issued two loan commitment letters, restated as of April 5, 2007 (the "Loan Commitment Letters"), committing to loan the Company some $12.233 billion needed to finance the LBO.

69.   A more detailed agreement reflecting the terms of the financing was executed on or about May 17, 2007.  This agreement formalized the Lead Banks' agreement to lend up to $8.028 billion for Step One of the LBO (the "Credit Agreement"), which was to close in early June 2007.

70.   The Credit Agreement provided for financing of Step One of the LBO through several different credit facilities: a two-year term facility in the amount of $1.5 billion (the "Tranche X Facility"), a seven-year term facility in the amount of $5.515 billion (the "Tranche B Facility"), a separate seven-year delayed draw facility in the amount of up to $263 million and a revolving credit facility in the amount of up to $750 million.  Those credit facilities are referred to collectively as the "Step One Financing,"

24

and the LBO Lenders that participated in them, or that acquired an interest in the loans from the LBO Lenders that originally participated, are referred to as the "Step One Lenders." The Credit Agreement also included the LBO Lenders' agreement to provide $2.105 billion of the financing needed for Step Two of the LBO through an "Incremental Facility" that would become part of the Tranche B Facility. The Step One Financing and the Incremental Facility make up the "Senior Credit Facility." The Loan Commitment Letters also committed the Lead Banks to provide up to $2.1 billion in financing for Step Two through the "Bridge Facility," which was junior in payment priority to the Senior Credit Facility.

71.    The Lead Banks knew that the amount of debt incurred in connection with the LBO would place the Company in a precarious financial condition. For example, a Citigroup employee closely involved in the transaction wrote, in an email to a colleague less than ten days before the Lead Banks committed to finance the LBO, that after reviewing information about the Zell proposal, "I am still extremely uncomfortable with Zell. No matter the rating . . . . Declining ebitda is scary. Until yesterday I did not know that Q1 cash flow is down 20 from last year . . . . I'm very concerned."

72.    The Lead Banks nevertheless aggressively promoted the transaction so that they could collect massive fees, while at the same time planning to limit their own exposure to a default in repayment of the loan by selling most of the lending obligation to a syndicate of lenders. For example, senior JPM executives pressed to close the LBO because JPM stood to earn extraordinary fees and build its relationship with Zell, whom JPM considered a potential source of lucrative future business.

73. One JPM analyst wrote to a colleague on April 5, 2007, the very same day the restated Loan Commitment Letters were issued:

> There is a wide speculation that the company might have put so much debt that all of its assets aren't gonna cover the debt in case of (knock, knock) you-know-what.  Well that is basically what we (JK and me and the rest of the group) are saying too, but we're doing this 'cause it's enough to cover our bank debt.

> So, lesson learned from this deal:  our (here, I mean JPM's) business strategy for TRB, but probably not only limited to TRB, is "hit and run" – we'll s_ck the sponsor's a$$ as long as we can, s_ck $$$ out of the (dying or dead) client's pocket, and we don't really care as long as our a$$ is well-covered.  Fxxk 2nd/private guys – they'll be swallowed by big a$$ banks like us, anyways.  See graph below (total debt, btw is $14,639MM).

74. JPM was highly focused on the fees it stood to earn from the transaction. For instance, a JPM Managing Director intimately involved in JPM's activity in the LBO made the following comments in internal emails:

- March 29, 2007:  "I am on vacation in Aspen but at this moment getting on a plane to Chicago to go to the Trib Board meeting tomorrow.  The actual fees to JPM will be closer to $75M for Trib (!!!!!!).... (But should help the budget!).  Probably worth me losing 2 days of skiing…:-)"

- March 29, 2007:  "On Trib, which has been back and forth and hush hush, we will get paid, I think, somewhere betw $20-$40M (wooooo hoooo!) on the financing over the course of the year."

- April 2, 2007 (responding to receipt of press release announcing JPM's role in the LBO):  "Thx dude.  Can you say ka-ching!!"

75. Like the Lead Banks, the Company recognized that the degree of leverage created by the LBO left the Company in a precarious situation in which even minor

underperformance compared to the Company's projections would leave the Company unable to meet its obligations as they came due.  Two Company executives acknowledged in an email exchange in the week before April 1, 2007, that if the Company performed only 2% worse than projected, "there is no equity value in the first 5 yrs."  On March 25, 2007, the Company learned that its revenue and operating cash flow for the first quarter of 2007 were, in fact, both 2% below the Company's plan.

76.    Analysts and rating agencies also warned that the Company would be unable to survive the burden of the LBO Debt.  For example, a Standard & Poor's research report dated April 19, 2007, identified a "default scenario" suggesting that, should the Company's performance prove worse than the Company's expectations, the Company would default on its LBO Debt obligations in 2009.

77.    While the Company and the Lead Banks worked on the financing of the LBO, the Company's financial performance worsened month by month.  The financial projections on which the LBO was based were finalized in early February 2007.  The Company's actual performance each month from February through May was materially worse than projected.  In April 2007, the Company's total operating profit was down 15% from the projections finalized two months earlier.  Operating profit from the publishing group alone was down 26% in April from the February 2007 projections.  The May results were even worse.  The Company's total operating profit was down 21% from the February projections.  The operating profits that the Company was counting on to pay interest on the massive debt load imposed by the LBO were disappearing as the Company and the Lead Banks finalized the financing.

## SUBORDINATING THE NON-BANK DEBT – THE GUARANTEES

78.   The Lead Banks were willing to arrange and finance the LBO only if they could effectively subordinate the Non-Bank Debt to the LBO Debt because, at all relevant times, they believed there was a high risk the Company would have to file for bankruptcy as a result of the LBO Debt.   On March 28, 2007, for example, a senior JPM employee wrote in an internal e-mail that he was concerned about the structure of the LBO Debt because the LBO Lenders would not be entitled to "post [bankruptcy] petition interest."   He added that "I've told the team I'm not comfortable approving the new structure for the reasons cited but would understand if Senor Mangement [sic] wanted to do this to further the Zell relationship [sic].   It's a question of lost income and leverage in a bankruptcy negotiation."

79.   The Bond Debt, by virtue of its indentures, shared *pari passu* in payment priority with other non-subordinated debt owed by the Company, thereby preventing a later lender to the Company from taking a more senior position.   The Lead Banks sought to avoid the provisions of the Bond Debt indentures, and effectively subordinate the Bond Debt, by insisting that the Guarantors, which did not guarantee the Bond Debt or the 2006 Bank Debt, guarantee all of the LBO Debt, including amounts used to refinance the 2006 Bank Debt (the "Step One Guarantee").   Without the Step One Guarantee, the Bond Debt would share with the LBO Debt *pari passu* in the equity of the Guarantors because they were owned by the Company.   By obtaining the Step One Guarantee from the Guarantors, the Lead Banks intended to obtain priority over the Bond Debt and to ensure that in the event of a bankruptcy, the first losses would fall disproportionately on the Bond Debt and the Non-Bank Debt generally.   As a result, the Company effectively

28

transferred the value of the Company's equity interest in the Guarantors to the LBO

Lenders (the "Step One Equity Value Transfers"), by putting the rights of the LBO

Lenders as creditors of the Guarantors ahead of the Company's rights as shareholder of

the Guarantors.

80.   The Credit Agreement required the Guarantors to issue guarantees in favor

of the Step One Lenders jointly and severally guaranteeing the full amount of the Step

One Financing, plus the amount of future disbursements contemplated to take place under

the Incremental Facility in connection with the Step Two Financing.  By executing the

Step One Guarantee, each of the Guarantors became jointly and severally liable for up to

$10.133 billion of debt, an amount far exceeding the net worth as of June 4, 2007, of each

individual Guarantor and of all Guarantors collectively.

81.   The Guarantors did not receive anything in exchange for the Step One

Guarantee.

82.   The Lead Banks also took other steps that were intended to make it more

difficult for the holders of the Non-Bank Debt to share recoveries equitably with the LBO

Debt in the event of a bankruptcy.  Those steps included the creation of two new

subsidiaries of the Company, Tribune Broadcasting Holdco, LLC ("Holdco") and

Tribune Finance, LLC ("Finance").  Holdco became the holding company for the

Company's broadcasting subsidiaries through the Company's transfer to Holdco of the

stock of the previous broadcasting holding company, Tribune Broadcasting Company.

Finance became a creditor of the Company's principal publishing subsidiaries through a

complex circle of transactions in which some $3 billion of the Step One Financing was

first distributed by the Company to Finance, then loaned by Finance to the publishing

subsidiaries and finally returned to the Company from the publishing subsidiaries by means of dividends, so that the $3 billion ended up right where it had started. The only difference was that now the publishing subsidiaries were obligated on substantial intercompany obligations in favor of Finance. All of these circular transactions occurred simultaneously by means of book entries on the day of the closing of Step One.

83.   Holdco and Finance are among the Guarantors of the LBO Debt. The Company also pledged its stock in Holdco and Finance to further secure the LBO Debt (the "Pledge"). The holders of the Bond Debt share *pari passu* in the Pledge by virtue of the bond indentures, but other holders of Non-Bank Debt do not.

84.   The Company and the Lead Banks agreed to the creation of Holdco and Finance and the complex related transactions in part to hinder, delay and impede the ability of Non-Bank Lenders to challenge the guarantees as fraudulent in the event of a bankruptcy. As newly created entities, Holdco and Finance had no pre-existing creditors, unlike the other Guarantors. The Lead Banks apparently believed, incorrectly, that this fact would make it more difficult for the Non-Bank Lenders to challenge the Holdco and Finance guarantees as fraudulent. Holdco and Finance effectively controlled all the value of the other Guarantors through Holdco's ownership of the broadcasting subsidiaries and Finance's loans to the publishing subsidiaries.

## CLOSING STEP ONE

85.   On or about June 4, 2007, the Company closed the tender offer for 126,000,000 shares. The tender offer was heavily oversubscribed. Approximately 224,000,000 shares, over 90% of the total shares outstanding, were tendered. Pursuant to

the terms of the tender offer, the Company purchased the 126,000,000 shares it had offered to purchase at Step One on a pro rata basis from the shares tendered.

86.    The Step One Financing also closed on June 4, 2007, and $7.015 billion of loan proceeds was disbursed as follows:  $4.284 billion was paid out to shareholders; $2.534 billion was paid to Citicorp as administrative agent for the 2006 Bank Debt to pay it off in full; and tens of millions of dollars were paid out as fees, costs or expenses associated with Step One of the LBO.

87.    The Company retained Valuation Research Corp. ("VRC") in March 2007 to opine on the Company's solvency in connection with both steps of the LBO.  The Company took a number of steps to ensure that it would obtain positive solvency opinions from VRC.  Before Step One closed, the Company, among other things: (i) agreed to pay VRC one of the largest fees it had ever received for issuing solvency opinions in connection with both Step One and Step Two; (ii) decided not to revise the overly optimistic performance projections upon which VRC relied uncritically for its Step One solvency opinion despite the fact that by early March 2007 the Company was materially underperforming relative to its plan; (iii) obtained a preliminary opinion from VRC, in May 2007, that the Company would be solvent after Step Two; and (iv) directed VRC to ignore Step Two in opining on solvency at Step One.  The Company's efforts succeeded in connection with the closing of Step One.  VRC issued opinions, dated May 17 and May 24, 2007, concluding that the Company would be solvent after giving effect to Step One of the LBO.

## THE COMPANY'S FINANCIAL PERFORMANCE WORSENS

88.    The Company's financial performance, particularly in the publishing side of its business, continued to fall far below the February 2007 projections after the Step One Financing closed on June 4, 2007.  The Company's operating profits from its publishing division for the first nine months of 2007 were down 24% from its February projections. Operating profits for the Company as a whole were down 14% from the February projections for the first nine months of 2007.

## ENSURING THE CLOSURE OF STEP TWO

89.    The closing of Step Two depended upon issuance of an opinion from VRC that the Company would be solvent after giving effect to Step Two.  Over and above the several steps it had previously taken to ensure that VRC opined that the LBO would not render the Company insolvent, senior management of the Company took additional steps between October and December 2007 to ensure that VRC would issue an opinion finding solvency at Step Two.

90.    On information and belief, those steps included: (1) preparing revised financial projections in October 2007 that dramatically increased the Company's projected growth rate in later years as compared to the February 2007 projections, even though the Company had consistently failed to meet the February projections; (2) instructing VRC to use the Company's inflated growth rate projections for later years, projections that VRC accepted uncritically; (3) instructing VRC to use a definition of "fair market value" that was contrary to well-established valuation principles, which VRC agreed to do; and (4) leading VRC to believe that Morgan Stanley had opined that

the Company would be able to refinance the LBO Debt when it came due in 2014 and 2015 when, on information and belief, Morgan Stanley had not done so.

91.   In October 2007, in anticipation of the closing of Step Two, the Company revised the February 2007 long-term financial projections on which the LBO was based. The Company sought to offset the effect of its deteriorating financial performance by making unjustifiable changes in the assumptions used for its February 2007 projections.

92.   Most notably, the Company's October 2007 projections assumed that the Company's operating cash flows would grow by 2.4% per year from 2012-2017, matching the projected growth rate from 2011-2012, a presidential election year in which the Company expected its advertising revenues to receive a substantial boost from election-related advertising.  In sharp contrast, the Company's February 2007 projections assumed that operating cash flows would grow by less than .5% per year from 2012-17. In other words, even though the Company was consistently falling short of its February 2007 projections, the October 2007 projections increased the assumed 2012-17 growth rate more than four times.

93.   The Company's October 2007 projections also increased the assumed growth rate for the Company's interactive business from the February 2007 projections. Although the Company had missed its February 2007 projections for the interactive business by more than 4% through September 2007, its October 2007 projections increased the assumed growth of the interactive business starting in 2009.  There was no reasonable justification for this changed assumption.

94.   The Company provided its October 2007 projections to VRC for use in preparing a solvency opinion in connection with Step Two, and VRC uncritically relied upon those projections in giving its December 20, 2007 solvency opinion.

95.   On information and belief, Company management instructed VRC to change its valuation methodology to use the Company's projected growth rate for 2012-17, and VRC agreed to adjust its approach without making an independent judgment whether this change was appropriate.  VRC's May 2007 solvency opinions for Step One did not rely on the 2012-2017 growth rates from the Company's February 2007 projections but instead calculated a "terminal value" for the Company's 2012 and later operating cash flows that implied an annual growth rate (after correction for a calculation error) of 0.8%.  In sharp contrast, VRC's December 2007 opinion used the inflated 2.4% growth rate assumptions for 2012-2017 from the Company's October projections. Donald Grenesko, the Company's Chief Financial Officer, supplied VRC with a representation letter supporting the 2.4% growth rate for 2012-2017, and VRC accepted and used that inflated projection without making any effort to determine whether there was any reasonable basis for it.

96.   These unjustifiable changes helped to ensure that VRC would issue a favorable solvency opinion by increasing the Company's enterprise valuation by more than $600 million from what it would have been had the Company and VRC used the same assumptions they had used earlier in the year.

97.   As a condition of issuing its December 20, 2007 solvency opinion, VRC also sought a representation from Company management concerning the Company's ability to refinance approximately $8 billion in LBO Debt when it came due in 2014 and

2015.  On or about December 1, 2007, Mose Rucker, a VRC Managing Director, called

Chandler Bigelow, then Tribune's Treasurer, and told him that VRC needed a

representation from the Company that it was reasonable for VRC to assume the Company

would be able to refinance the LBO Debt.  Mr. Rucker also asked that Mr. Bigelow speak

to the Company's financial advisor to make sure that the advisor agreed that the

refinancing assumption was reasonable.

98.    On or about December 2, 2007, Mr. Bigelow, Mr. Grenesko and other

members of Company management called Bryan Browning, a VRC Senior Vice

President.  During that conversation, Bigelow and/or Grenesko stated that Morgan

Stanley, financial advisor to the Special Committee, had agreed that the Company could

refinance its debt in 2014 even in a "downside" scenario.  Upon information and belief,

Morgan Stanley had not told the Company that it agreed with management's refinancing

assumptions.

99.    The Company provided a representation letter to VRC, signed by Mr.

Grenesko and dated December 20, 2007, that stated in part:  "Based upon (i)

management's best understanding of the debt and loan capital markets and (ii)

management's recent discussions with Morgan Stanley, management believes it is

reasonable and appropriate for VRC to assume that Tribune . . . would be able to

refinance."  VRC's Step Two solvency opinion relied in part on that representation letter,

expressly citing management's purported discussions with Morgan Stanley regarding the

company's ability to refinance its debt when it came due.  Upon information and belief,

Morgan Stanley in fact had not advised management that it was reasonable and

appropriate for VRC to assume that Tribune would be able to refinance the LBO Debt.

## THE LEAD BANKS AND STEP TWO

100.  As Step Two of the LBO approached, the defendants knew that Company performance continued to decline and that piling the Step Two Debt on the Company, which was already highly leveraged after Step One, made insolvency a reasonably likely result of the LBO.

101.  In the summer of 2007, the Lead Banks were aware that financial analysts were expressing concern about the Company's ability to survive the LBO.  On August 14, 2007, the Lehman Brothers analyst tracking the Company warned that "[i]f the privatization deal does end up going through [as a result of Step Two], we continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% – given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs . . . .  So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."

102.  Also in August 2007, S&P lowered Tribune's corporate credit rating from BB- to B+, and the bank loan rating from BB+ to BB.  The downward change "reflect[ed] deterioration in expected operating performance and cash flow generation compared to previous expectations."

103.  Moreover, the Lead Banks performed internal analyses between September and December 2007 that showed that, in reasonably foreseeable circumstances, completion of the LBO would render the Company insolvent.

104.  The Lead Banks were concerned enough about the Company's solvency to retain their own solvency firm, Murray Devine, to assist them in understanding issues bearing on the Company's solvency.  The LBO Lenders instructed Murray Devine not to provide them with an opinion as to whether the Company was solvent or would be after Step Two.

## CLOSING STEP TWO

105.  The Company obtained the necessary regulatory approvals from the FCC on November 30, 2007.  Step Two closed on December 20, 2007, triggering the conversion of the remaining outstanding shares of the Company to cash at $34 per share, as provided in the Merger Agreement.

106.  The financing for Step Two had been committed by the Lead Banks in the Commitment Letters and consisted of two facilities:  the Incremental Facility of $2.105 billion and up to $2.1 billion in the Bridge Facility (together, the "Step Two Financing").  The Incremental Facility funding was provided through a series of "Increased Joinders" executed on or about December 20, 2007, by which various LBO Lenders added this funding to the Tranche B Facility originated in the Step One Financing.  Because of this structure, the Incremental Facility loan was accorded the priority of the Tranche B Facility and was covered by the Step One Guarantee.

107.  Concerns about the continued deterioration of the Company's financial performance led to negotiations regarding the amount of the Step Two Financing.  These negotiations led to an agreement between the Company and the Lead Banks to reduce the amount of the Bridge Facility from $2.1 billion to $1.6 billion.  The result of this

reduction was to reduce the exposure of the LBO Lenders on the highest risk portion of the LBO Debt.

108.  On December 20, 2007, the day Step Two closed, the Company issued notes in favor of JPMCB as administrative agent for the Senior Credit Facility with respect to the Incremental Facility and in favor of MLCC as administrative agent for the Bridge Facility (together, the "Step Two Notes").

109.  At the same time, the Guarantors executed a separate guarantee of the $1.6 billion Bridge Facility (the "Step Two Guarantee"), subordinate to the Step One Guarantee, by which the Guarantors jointly and severally unconditionally guaranteed repayment of the Bridge Facility.  Through the execution of the Step Two Guarantee, the Guarantors increased their obligation to $11.733 billion.  As with the Step One Guarantee, the Company effectively transferred the value of the Company's equity interest in the Guarantors to the LBO Lenders by means of the Step Two Guarantee (the "Step Two Equity Value Transfers," taken together with the Step One Equity Value Transfers, the "Equity Value Transfers"), by putting the rights of the LBO Lenders as creditors of the Guarantors ahead of the Company's rights as shareholder of the Guarantors.  The amount of indebtedness guaranteed by the Step One and Step Two Guarantees far exceeded the net worth as of December 20, 2007, of the Company and of each individual Guarantor and of all Guarantors collectively.

110.  Furthermore, in connection with and at the same time as the Guarantors executed the Step Two Guarantee, the Guarantors executed two Indemnity, Subrogation and Contribution Agreements (the "Subordination Agreements"), one for Step One and one for Step Two.  The Subordination Agreement respecting the Step One Financing was

executed by the Guarantors six months after the Step One Financing transaction as an attachment to the Increased Joinders executed by certain lenders and the Company for the funding of the Incremental Facility.  It had the effect of subordinating indemnity, subrogation and/or contribution claims from a Guarantor and the Company or between or among Guarantors to the claims of the Step One Lenders.  The Subordination Agreement respecting the Step Two Financing was executed by the Guarantors at the time of the Step Two Financing and subordinated to the Bridge Facility all of the Guarantors' rights to assert indemnity, subrogation and/or contribution claims such Guarantors then had or thereafter acquired against the Company or other Guarantors.  The effect of the Subordination Agreements was to divert additional value in the Guarantors away from the Non-Bank Lenders in the event of non-payment by the Company of the debt incurred in the Step One or Step Two Financings and thereby to reduce the equity value of the Guarantors available to the Company or to its Non-Bank Lenders.

111.  Thus, in connection with the Step Two Financing, the Company and the Guarantors became liable for the additional sum of approximately $3.7 billion, which was used entirely, along with prior borrowings, to complete the conversion of the remaining 117,115,055 shares of stock to a right to receive $34 per share, for a total of $3,981,911,860.

112.  The Guarantors did not receive anything in exchange for the Step Two Guarantee.

113.  In conjunction with the closings of the Step One and Step Two Financings (together, the "LBO Financing") and the tender offer, the LBO Fees were paid to the Lead Banks and certain others.  Those defendants who received the LBO Fees are